# United States Court of Appeals
## For the First Circuit

_____

No. 00-1621

JOHN M. MCCAMBRIDGE,
Petitioner, Appellant,

v.

TIMOTHY HALL, SUPERINTENDENT,
Respondent, Appellee.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

_____

Before

Boudin, Chief Judge,
Campbell, Senior Circuit Judge,
Torruella and Selya, Circuit Judges,
Cyr, Senior Circuit Judge,
and Lynch, Lipez and Howard, Circuit Judges.

_____

John M. McCambridge on brief pro se.
Elizabeth L. Prevett, Federal Defender Office, on brief for amicus curiae Federal Defender Office.
James J. Arquin, Assistant Attorney General, and Thomas F. Reilly, Attorney General, on brief for appellee.

_____

August 27, 2002

_____

OPINION EN BANC

**LYNCH**, **Circuit Judge**. Petitioner John M. McCambridge appeals the district court's denial of his habeas corpus petition challenging the constitutionality of his state conviction for manslaughter. A panel of this court had earlier reversed the district court and granted his petition, holding: (1) that the prosecution failed to disclose exculpatory evidence and improperly took advantage of the absence of this evidence in its closing arguments, in violation of McCambridge's right to due process; and (2) that the Massachusetts Appeals Court decision holding otherwise was contrary to and an unreasonable application of clearly established Supreme Court law. McCambridge v. Hall, No. 00-1621, slip op. (1st Cir. Sept. 24, 2001). That opinion was withdrawn when the full court subsequently granted the Commonwealth's petition for en banc review. We now affirm the district court's denial of habeas corpus.

**I.**

John McCambridge was charged in 1994 with first degree murder, weapons violations and various motor vehicle offenses. The charges arose out of a shooting and a motor vehicle accident involving McCambridge and the victim, Richard Doyle. McCambridge admitted to the shooting and said he acted in self-defense. The jury rejected the murder charge and the charge that he was operating a motor vehicle after his license had been revoked or suspended, but it convicted him of manslaughter, unlawful possession of a firearm, operating a motor vehicle under the

influence of alcohol, and reckless operation of a motor vehicle. He is currently serving a sentence of fifteen to twenty years.

We describe the facts pertinent to the grounds of decision as they were found by the state court, Commonwealth v. McCambridge, 44 Mass. App. Ct. 285, 690 N.E.2d 470 (1998), fleshed out by other facts contained in the record and consistent with the state court findings. We are bound to accept the state court findings of fact unless McCambridge convinces us, by clear and convincing evidence, that they are in error. 28 U.S.C. § 2254(e)(1). On no point has he done so.

McCambridge and Doyle were drinking friends and former co-workers. The two had been out drinking together at a bar in Cambridge on the night of the incident, which occurred in the early hours of November 11, 1993. At the bar, McCambridge argued with the bartender, screaming at him either because of the television set, or because of McCambridge's attentions to the bartender's girlfriend. Leaving the bar around one a.m., Doyle and McCambridge drove off together in Doyle's van.

At about two a.m., a state trooper observed a traffic disturbance on the Southeast Expressway, which was caused by the van weaving through the southbound lanes and driving unusually slowly, about forty miles per hour, on this major road. The trooper turned on his lights and siren in an attempt to pull over the van, but the van continued to weave through the lanes. The van then accelerated to between fifty miles per hour and sixty-five miles per hour and swerved into the cement curbing on the right

shoulder of the Expressway. After the van hit the right shoulder, it fish-tailed across the road, turning perpendicular to the Expressway and slowing to a speed of about thirty-five miles per hour. The van then struck the cement center median head-on, hitting first on the front right side, then with the whole front of the van. The van went up into the air, rising several feet, and landed with the driver's side down, facing the wrong way down the road. The van then skidded backwards about ten feet, rotating 360 degrees as it slid. The trooper also said that, as the van went into the center median, he saw a head in the driver's seat area; the head smashed into the windshield as the van hit the ground. The trooper estimated that about two minutes passed from when he first saw the van until the crash, and that the van had traveled about two or two-and-a-half miles, weaving and then crashing.

A second witness, an off-duty state trooper, saw the van weaving through the Expressway lanes, then fish-tailing into the right shoulder, crossing the Expressway into the center median, rising up into the air, and landing on the driver's side. A third witness saw the van weaving across lanes, then actually rocking back and forth before it hit the right shoulder, at which point it shot straight across the road into the center median, and flipped onto its side, landing with the driver's side down on the pavement.

The trooper and other witnesses found McCambridge in a fetal position in the area of the driver's seat, bleeding from a head injury. Rescue personnel had to remove the van windshield in order to free McCambridge from the vehicle. As the rescue

personnel were removing McCambridge's outerwear, a derringer pistol fell out of his clothing.

Doyle had been thrown from the van and his head was pinned under the driver's side rear wheel so that only his body was visible. His clothing had been torn off around the neck area, leaving his chest completely exposed. The state troopers at the scene reported that his skin appeared blue or grayish, he was not breathing and he had no pulse, although one paramedic testified that Doyle was still warm to the touch when the paramedic arrived. There was no attempt to resuscitate him. Doyle was pronounced dead upon arrival at the hospital. He had been shot once in the right cheek and once in the back (in the area of the right shoulder). He also had a head wound indicating that the back of his head had struck or been struck with a linear object that was at least three inches in length and had no sharp or rough edges. Doyle's blood alcohol level was 0.22%.

In the van, the troopers found a Smith & Wesson semiautomatic pistol; the safety was off and the gun was cocked, loaded, and ready to fire. The police also found a billy club with blood on it that was consistent with Doyle's blood type and two boxes of ammunition, each corresponding to one of the two guns. Doyle had been living in the van prior to the crash, and the van was used by a homeless advocacy organization to transport individuals to shelters.

The prosecution's theory at trial was that McCambridge had shot Doyle and was driving the van, en route to dumping the

body, when the crash occurred. McCambridge admitted shooting Doyle, but argued he did so in self-defense. More specifically, McCambridge claimed that Doyle, in a drunken rage, was threatening to shoot him for implying that Doyle was a child abuser. McCambridge says that the derringer was Doyle's, which Doyle himself had placed on the dashboard, as he was on his way to sell the gun to a customer in Quincy.

McCambridge testified that the argument in the van had its genesis in a conversation between Doyle and himself, a month or so before the shooting. In that conversation, McCambridge says he told Doyle that he had heard Doyle had been convicted for child abuse. Doyle, after initially denying the charge, admitted it was true, said he had done his time for it, and said he didn't want to hear any more. Doyle told McCambridge that "if [McCambridge] ever threw it up to him, his face again . . . he'd put a bullet in [McCambridge's] frigging head."

Despite this warning, McCambridge says he raised the topic again in the van, just prior to the shooting. McCambridge testified that the argument began after leaving the bar, when McCambridge asked Doyle, who was driving, to give him a ride to his ex-wife's house. Doyle said he had to make a phone call and left the van. When he returned, Doyle said he had to go to Quincy because he had a customer for a derringer pistol. Doyle pulled the derringer out from under the seat and threw it on the dashboard. McCambridge again asked to be taken to his ex-wife's, but Doyle drove on toward Quincy. This angered McCambridge and so he told

Doyle he was drunk and called Doyle a name implying that Doyle had abused a child. McCambridge testified that Doyle then pulled out a nine-millimeter Smith & Wesson from his waist band, and threatened McCambridge with it. McCambridge testified that he pushed downward on Doyle's right hand, while Doyle pushed upwards, and that he begged Doyle to put the gun down. At the same time, McCambridge says he grabbed the derringer from the dashboard. He saw Doyle cock the hammer of the Smith & Wesson, so he shot Doyle in the face with the derringer. McCambridge testified he had no memory of anything else until he woke up in the hospital.

According to a ballistics expert's testimony at trial, Doyle had been shot with the derringer pistol that fell out of McCambridge's clothing at the accident scene. The ballistics expert testified that the derringer needed to be manually loaded, would only bear two cartridges, and needed to be manually cocked each time the weapon was fired. He further testified that it would take between thirteen and sixteen pounds of pressure to pull the trigger, which he characterized as "a very heavy trigger pull." He also testified that he would expect a considerable flash when the gun was fired, "enough to instantaneously brighten a darkened room." The state trooper pursuing the van testifed that he saw no flash or other light from the van's interior.

A forensic chemist testified at trial for the prosecution that, in her opinion, Doyle was shot while he was in the driver's seat of the van; but at the time of the accident, Doyle was

probably near the sliding passenger's side door and McCambridge in the driver's seat. This supported the prosecution's theory of the case, which was that McCambridge had shot Doyle sometime after leaving the bar, and then deposited his body in the back of the van. She testified that Doyle's blood was spattered in a downward and outward direction on the driver's side door in a manner suggesting a high-velocity impact, such as from a gunshot wound, with blood dripping down the door. This indicated that the van was in an upright position when the blood spattered on the door. She testified that the hardening around the edges of blood droplets suggested that the blood on the upper part of the window remained undisturbed for about three minutes and that the larger quantities of blood, dripping down the driver's side door, were undisturbed for at least five minutes.

Blood matching Doyle's type was found on the driver's seat and had soaked through the upholstery into the cushion, and a pool of Doyle's blood type had collected under the driver's seat. There was also blood on the seat of McCambridge's jeans that was consistent with Doyle's blood; the forensics expert testified that the stain was consistent with McCambridge sitting in blood, rather than merely wiping up against blood. More of the Doyle-type blood was found on the front leg of McCambridge's jeans; on a jacket belonging to McCambridge, which the police found in the back of the van after the crash; and on the billy club found in the van. Doyle's blood was also on the passenger's side sliding door, which was off the hinges at the bottom, and open "like a flap." Fibers

from Doyle's sweater were fused to the lower portion of the sliding door, indicating that the sweater had struck the door with great force. She also testified that, based on the stippling marks on Doyle's clothing, she believed the gunshot wound in Doyle's back was caused by a shot fired from a distance of three feet or greater.

As for McCambridge, the forensics expert found tissue, hair and blood on the upper passenger's side corner of the windshield and on the passenger's side dashboard that appeared to be McCambridge's, as well as on the rear-view mirror (which was detached from its proper place). McCambridge's blood was also found on his sweater and the jacket he was wearing at the time of the crash. The expert also found glass fragments from the windshield and the passenger's side window in McCambridge's clothes, indicating that McCambridge was probably in contact with the passenger's side window when it broke. (There was no such evidence that Doyle had come in contact with the broken windshield.)

The Commonwealth had a specialist in accident reconstruction testify. He supported the witnesses' memories of the crash, and opined that Doyle's body must have been ejected from the flapping passenger's side sliding door at the first impact. He also testified that, upon impact, the occupants of the van would have been thrown forward and to the right. He further testified that the driver was likely to have been pinned behind the wheel.

The medical examiner who testified for the Commonwealth stated that the manner in which Doyle's impact wounds bled suggested that it was possible that he was still alive at the time of the crash, but that he could not be sure. He based this upon the fact that there was blood in the tissues surrounding the impact abrasions, which could indicate that Doyle's heart was still pumping blood at the time of impact, but that could also be caused by the body being turned multiple times.[1] The medical examiner's opinion was that Doyle was shot first in the cheek, from a distance of six to eight inches to the right of the right cheek; this shot probably would have killed Doyle within eight minutes. He stated that the second gunshot, to the upper right back shoulder area, severed Doyle's aorta and thus probably would have killed Doyle in less than two to three minutes, and definitely in less than eight minutes. He also concluded that, based on the amount of blood that Doyle had inhaled into his lungs, Doyle had time to take at least a few breaths between the two shots. Based on Doyle's blood alcohol content and the fact that Doyle had absorbed all the alcohol in his stomach, the medical examiner estimated that Doyle had stopped drinking about ninety minutes prior to being killed. The medical expert also testified that Doyle's head wound was consistent with a blow from a billy club, such as was found in the van.

---

[1] He testified that it also could have been caused by attempts to resuscitate Doyle, but none of the witnesses recalled any attempts at resuscitation.

McCambridge's forensics expert testified that, upon impact, the passenger would be propelled forward into the right-hand corner of the windshield, but that the steering wheel and console could prevent the driver from hitting the windshield, instead sending the driver back, through the twenty-nine inch space between the front bucket seats, and out the passenger's side sliding door. He further testified that the derringer has an average muzzle energy of 95 foot pounds, roughly equivalent to a punch from a professional boxer, whereas the Smith & Wesson has an average muzzle energy of 355 foot pounds. Due to the relatively weak muzzle energy of the derringer, he testified that it was possible for Doyle to have been shot once and still have remained conscious, active, and possibly even more aggressive because of the wound.

Since the habeas issue asserted is based on the question of evidence as to whether or not Doyle had been convicted of child abuse, we go into detail on this point. At trial, the prosecution called Doyle's brother. During the testimony, McCambridge's counsel asked for a side-bar and informed the court that, if the Commonwealth planned to challenge the truth of Doyle's conviction for child abuse, he would like the opportunity to cross-examine Doyle's brother about whether Doyle had served time for child abuse.[2] At that point, the prosecution said it was not certain whether it intended to challenge the truth of the conviction. The

_____

[2] Prior to trial, McCambridge, proceeding pro se, had unsuccessfully requested Doyle's "rap sheet" by means of a hand-written letter to the prosecutor.

-11-

court said that it would keep Doyle's brother available to be recalled as a witness if the prosecution decided to argue that Doyle had not been convicted.

Later, during McCambridge's testimony, the prosecutor objected on hearsay and prejudice grounds to McCambridge referring to Doyle's conviction. The prosecutor said the prejudice outweighed any probative value. The court asked if there was a conviction on the charge. Defense counsel represented there was a conviction, but said "whether it's true or not in some ways is irrelevant." At that point, the judge asked counsel whether either had checked Doyle's probation record. The prosecutor replied, "It just says -- it doesn't say what for. I have no idea what it's for." The judge allowed McCambridge to testify to his first conversation with Doyle about the conviction, agreeing that it went to McCambridge's state of mind, which was relevant to the self-defense theory, and not for the truth of the conviction, which was not relevant to self-defense. On cross-examination of McCambridge, the prosecutor raised the issue of the conviction, and then asked, "You know Mr. Doyle is deceased?," to which McCambridge answered yes. The prosecutor then asked, "He can't refute your allegations right now; can he?" The defense objected to that question, and the objection was sustained.

Near the conclusion of the defense's case, defense counsel requested a side-bar to clarify whether he needed to recall Doyle's brother. That turned, he said, on whether the prosecution intended to impugn McCambridge's credibility by arguing that Doyle

-12-

had never been convicted or in jail, when there was no evidence either way on this point. The prosecutor took the position that Doyle had not been in jail, that the defense counsel could ask the question of Doyle's brother if he wanted, and that it was up to the defense, not the prosecution, to put Doyle's criminal record into evidence. When asked by the court, the prosecutor said, "He wasn't in jail, Judge," and then, when the court further asked if Doyle was convicted, the prosecutor responded "No. No." The prosecutor said all he had seen on the record was spousal abuse, "so far as [he knew, Doyle] had never been in jail," and that was all he could say on the matter.

Defense counsel said he did not have access to the criminal record and would like it produced. He said he did not want to make it part of the case but that he "d[id]n't want to open it up for argument that [he] didn't prove that [Doyle] had one, and, therefore, [McCambridge] was lying." The court asked the prosecution what it intended to argue on the issue. The prosecutor replied that he had no problem if the defendant called the brother "because, as far as I know, there is no record that Mr. Doyle had any convictions." When the judge inquired further, the prosecutor said he should not be put in the position of disclosing what his closing argument would be. He foreshadowed what he might do by saying McCambridge "gets up there and says [Doyle's] done time when I know he hasn't from the records I've seen. And if [McCambridge has] got the record, he can [attempt to introduce it.]" The court then interjected that the information had come in only for the

-13-

state of mind of the defendant.  The prosecutor said that was all he was going to argue.

In his closing argument, the defense counsel was careful to emphasize that McCambridge's testimony about Doyle's conviction was offered only to show his state of mind and that there was no evidence that Doyle ever molested or abused any child.  He stated that "[t]here is simply no evidence one way or another . . . . There is no evidence that he did it.  There is no evidence that he didn't do it.  It was admitted for . . . the state of mind."  The prosecutor, in turn, in his closing referred to the earlier conversation:

> Does the defendant have something for you to believe when he gets up there and says, oh, yeah, I had an argument with Richard Doyle because of child molestation? There is absolutely evidence of that.  Was that put in there to tell you what his frame of mind was? No. That was his third shot at the victim from the stand, assassinating his reputation with no evidence. That's what that was for, I suggest to you, not to show state of mind.

Literally read, the prosecution admitted there was evidence that defendant had an argument with Doyle in the aftermath of the child abuse accusation, but that the real purpose for the testimony was to impugn the victim, not to show McCambridge's state of mind.[3]

---

[3]    The now-withdrawn panel opinion of this court assumed that there had been a typographical error and that the transcript omitted the word "no" between "absolutely" and "evidence."  But the transcript sentence and the flow of the argument make perfect sense as stated.   The prosecutor may well have meant that there was evidence of the conviction, or of the prior conversation, but no evidence of the alleged confrontation the night of Doyle's death. This was the transcript that the state court had and McCambridge's brief before the Massachusetts Appeals Court cited the passage as it appeared in the transcript, with no modifications.  If there was

Defense counsel did not object to the prosecution's closing statement.  Nor was the closing statement presented as error to the state courts on McCambridge's direct appeal.

## II.

McCambridge appealed his conviction to the Massachusetts Appeals Court, presenting three main arguments: that the derringer and his clothes were the product of an unlawful search and seizure and should have been suppressed; that the jury should have been instructed on the possibility of a necessity defense to the firearms charge; and that "the trial court erred by not requiring Doyle's criminal record to be made part of the record, and the prosecutor may have violated the defendant's state and federal due process rights by not disclosing that record."  On this third argument, McCambridge argued:

> The suppression of material evidence favorable to the accused and requested by him violates the due process clause of the Fifth Amendment. Brady v. Maryland, 373 U.S. 83, 87 (1963).  In the case at bar, because the trial court refused to require the Commonwealth to produce Doyle's criminal record, the defendant cannot prove that exculpatory evidence was withheld. . . . Thus, this Court should order the Commonwealth to produce Doyle's criminal record so that an appellate decision can be made.  In the alternative, the case should be remanded to the Superior Court for production of the document at issue.

an error in the transcript which worked against the defendant, under state law he should have sought to correct the transcript. Mass. R. App. Pro. 8(e).  The first suggestion that a word was omitted from the transcript appears to be in the brief that the Commonwealth submitted before the panel of this court. Our holding here does not turn on whether or not the word "no" should have been included, and so we do not need to decide the point.

The Commonwealth responded that McCambridge had not requested that Doyle's record be marked as an exhibit until the sentencing stage, that the proper means for challenging a failure to disclose exculpatory evidence would have been through a motion for new trial under Massachusetts Rule of Criminal Procedure 30(b), and that the conviction record was not material to the verdict because "the jury clearly believed the defendant's testimony regarding a confrontation with the victim," since they convicted him only of manslaughter.

After filing its brief with the state appeals court, the Commonwealth filed a Motion to Expand the Record to include Doyle's criminal record, which did in fact contain a conviction for child neglect and a notation that Doyle served six months in jail for this conviction. The Commonwealth's motion explained that, at trial, the prosecutor had only a partial print-out of the record, which had no mention of the child neglect conviction, and included as an appendix a copy of this truncated print-out.

In his reply brief, McCambridge argued that "the Commonwealth has now disclosed that exculpatory evidence was withheld at trial" and, citing Brady v. Maryland, 373 U.S. 83 (1963), and United States v. Bagley, 473 U.S. 667 (1995), maintained that he was entitled to a new trial.

On appeal, the Massachusetts Appeals Court held:[4]

> Failure to mark Doyle's criminal record for identification. The defendant requested the trial judge

---

[4] The court reversed the firearms conviction, agreeing that the judge should have instructed the jury on a necessity defense.

-16-

at the sentencing hearing to mark Doyle's criminal record as an "exhibit." The judge denied the request and the defendant claims it was error, for the record was necessary to support his claim that the prosecution had withheld exculpatory evidence from him. The defendant claimed that Doyle's record would have supported his claim that Doyle had been convicted of child abuse, which would have corroborated the defendant's testimony at trial that Doyle pulled a gun on him when the defendant called Doyle a name indicating he was a child abuser, which accusation on a prior occasion had prompted Doyle to threaten the defendant's life if he ever accused him of this offense again. While the defendant pressed for the introduction of the victim's criminal record at trial, he did not object when the judge did not order its production or request that the record be marked for identification. He cannot now be heard to complain that the judge failed to do so at the sentencing stage.

In any event, assuming without deciding that the prosecutor should have produced the victim's record, there was no prejudice to the defendant because he was aware of the victim's record and was prepared to offer such evidence at trial. Moreover, by convicting the defendant of manslaughter, the jury obviously credited the defendant's testimony that the struggle in the van was precipitated by the defendant's remark about this offense to Doyle. See Commonwealth v. Tucceri, 412 Mass. 401, 412-14, 589 N.E.2d 1216 (1992).

McCambridge, 690 N.E.2d at 475. In essence, the court held that McCambridge had forfeited the issue at trial and could not resuscitate it by raising it at sentencing. It also held in the alternative that McCambridge suffered no prejudice from the absence of Doyle's record.

McCambridge then filed an application to obtain further review with the Massachusetts Supreme Judicial Court (SJC). He argued that

the defendant was dissuaded from attempting to put [the criminal record] evidence before the jury because the prosecutor misled the defense by representing that the alleged victim did not have a record and in any event that the issue wouldn't be argued in closing. The withholding of information with the intent to mislead and

-17-

prejudice the defendant, and the exploitation of that misdirection in closing argument violated the defendant's rights to a fair trial.

McCambridge cited Brady and Commonwealth v. Tucceri, 412 Mass. 401, 589 N.E.2d 1216 (1992), a Massachusetts case on failure to produce exculpatory evidence, as support. The Commonwealth responded that "any failure to produce the victim's criminal record did not prejudice the defendant." The SJC, without opinion, denied further appellate review. Commonwealth v. McCambridge, 427 Mass. 1103, 707 N.E.2d 1076 (1998).

## III.

In January 1999, McCambridge filed a petition for habeas corpus under 28 U.S.C. § 2254 (1994 & Supp. II 1996) in the District of Massachusetts. He argued that his detention is unconstitutional because the trial court erroneously admitted the seized clothing and gun into evidence in violation of both his Fourth and Fifth Amendment rights; that the trial court failed to instruct the jury on the necessity defense; and that the prosecutor improperly withheld exculpatory material, namely, Doyle's conviction record. On the Commonwealth's motion, the district court dismissed McCambridge's first argument as to the seized clothing and gun, because it was essentially a Fourth Amendment claim that was not reviewable on habeas. McCambridge v. Hall, 68 F. Supp. 2d 1, 4 (D. Mass. 1999). The district court subsequently held that the gun charge error did not affect the manslaughter conviction, as "[t]he question put to the jury was not whether McCambridge used an unlawful device when defending himself, but

-18-

rather whether he used excessive <u>force</u>."  <u>McCambridge</u> v. <u>Hall</u>, 94 F. Supp. 2d 146, 154 (D. Mass. 2000).

The district court also held that McCambridge had procedurally defaulted on his claim that the prosecutor's failure to disclose Doyle's conviction record violated McCambridge's rights under <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963), and <u>Giglio</u> v. <u>United States</u>, 405 U.S. 150 (1972).  <u>McCambridge</u>, 94 F. Supp. 2d at 154-55.  The district court referred to the Massachusetts Appeals Court holding cited above, noting that "[p]rocedural default acts as an independent and adequate state ground to uphold the conviction." <u>Id.</u> at 155.  The court further held that McCambridge had not shown that "some objective factor external to the defense impeded defense counsel's efforts to comply with the state's procedural rule," <u>id.</u> at 155-56, nor had he shown "actual prejudice" from the prosecution's failure to produce the criminal conviction, <u>id.</u> at 156, nor any miscarriage of justice, <u>id.</u>  The court reasoned:

> The actual contents of Doyle's criminal record are not relevant to this analysis because the details of the actual criminal record were not known to McCambridge at the time of the homicide. . . . Rather, McCambridge believed, from whatever source, that Doyle had a criminal history of child abuse, knew that accusations of child abuse were likely to provoke violence from Doyle, and after such provocation became fearful of his life when Doyle drew a gun.  To these facts McCambridge testified at his trial, and the jury must have accepted that his provocation story at least raised some reasonable doubt in order to convict on manslaughter rather than first- or second-degree murder.

<u>Id.</u>

The district court declined to issue a certificate of appealability.  This court subsequently issued a certificate of

-19-

appealability on McCambridge's Brady claim. On appeal, a panel of this court reversed the district court and granted the habeas petition. McCambridge v. Hall, No. 00-1621, slip op. (1st Cir. Sept. 24, 2001). The panel held that the state court's determination that McCambridge's counsel should have objected at trial to the failure of the court to order the prosecutor to produce the record and to mark it into evidence was contrary to clearly established federal law, and its conclusion that McCambridge suffered no prejudice was an unreasonable application of the law to the facts. The panel held that, under clearly established federal law, a defendant may rely on a prosecutor's representations that she has fully complied with her Brady disclosure requirements, and therefore, need not object. Id. at 17-18. Further, the panel held that the prosecutor's insinuation in his closing that McCambridge had invented the entire story about Doyle's criminal conviction prejudiced McCambridge and "may well have tipped the balance in favor of a manslaughter conviction." Id. at 38.

**IV**.

A habeas petitioner must meet certain preliminary criteria before we can reach the merits of his claim. He must have fairly presented his claims to the state courts and must have exhausted his state court remedies. 28 U.S.C. § 2254(b)(1)(A). Further, if the state decision rests on the adequate and independent state ground of procedural default, then federal habeas review is unavailable absent a showing of cause and prejudice, or

-20-

a showing that a miscarriage of justice will otherwise result. Strickler v. Greene, 527 U.S. 263, 282 (1999); Gunter v. Maloney, 291 F.3d 74, 78 (1st Cir. 2002); Burks v. Dubois, 55 F.3d 712, 716 (1st Cir. 1995).

The district court here held that the state court decided that McCambridge had procedurally defaulted the claim he now makes, and that finding of procedural default constitutes an adequate and independent state ground. McCambridge, 94 F. Supp. 2d at 155. The district court held that McCambridge had shown neither cause nor prejudice. Id. at 155-56. The district court also agreed with the Appeals Court's alternate holding, that even if the prosecution should have produced the record, there was no prejudice to McCambridge. Id. at 156.

Some members of the majority agree with each of the district court's holdings. All members of the majority agree on the district court's no-prejudice holding, and so, without discussion or elaboration of the procedural default argument, we address the issue of whether the state court's conclusion that McCambridge was not prejudiced was an unreasonable application of the law.

Under the standard established in the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1219 (1996), a federal court may not issue a habeas petition "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the state court decision: 1) "was contrary to, or involved an unreasonable application of,

-21-

clearly established Federal law, as determined by the Supreme Court of the United States" or 2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (Supp. II 1996). A state court's findings on factual issues "shall be presumed to be correct" and the petitioner bears the burden of disproving factual findings by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## A. Applicability of § 2254

We first deal with, and reject, the argument of amicus that we must review the prejudice issue de novo, rather than look to whether the state court's determination is unreasonable. The Federal Defender's Office[5] asserts that the Massachusetts state court analyzed McCambridge's <u>Brady</u> claim solely under a Massachusetts state standard and therefore his federal claim was never "adjudicated on the merits" within the meaning of § 2254. If that were so, we would review McCambridge's <u>Brady</u> claim de novo, rather than asking whether the state court's holding is "contrary to, or . . . an unreasonable application of, clearly established Federal law," the standard required by § 2254. See <u>DiBenedetto</u> v. <u>Hall</u>, 272 F.3d 1, 6-7 (1st Cir. 2001), <u>cert.</u> <u>denied</u>, 122 S.Ct. 1622 (2002); <u>Fortini</u> v. <u>Murphy</u>, 257 F.3d 39, 47 (1st Cir. 2001), <u>cert.</u> <u>denied</u>, 122 S.Ct. 1609 (2002).

---

[5] This court invited the Federal Defender's Office to file an amicus brief in support of McCambridge and we thank the Office for its assistance.

-22-

It is true that the relevant portion of the Massachusetts Appeals Court decision cites only to a state court decision, Tucceri, 589 N.E.2d 1216. The state court inquiry did focus on whether there was "prejudice" to the defendant, which is the relevant federal standard. See Strickler, 527 U.S. at 281-82. But the Federal Defender's Office argues that Tucceri established a standard for prejudice that is different from the federal standard, and the citation to Tucceri indicates that the court was not using the federal standard to determine prejudice.

Tucceri states explicitly that it is articulating a state law standard that is "more favorable to defendants than the Federal Constitutional standard." 589 N.E.2d at 1223 n.11. There is no dispute that this is so. If the conviction survives this more lenient state standard, then, absent exceptional circumstances, it follows that the conviction would survive the federal standard, and we see no reason the state courts would be required to say explicitly that both standards are met. If there is a federal or state case that explicitly says that the state adheres to a standard that is more favorable to defendants than the federal standard (and it is correct in its characterization of the law), we will presume the federal law adjudication to be subsumed within the state law adjudication. Cf. DiBenedetto, 272 F.3d at 6 (stating that de novo review applies when "the state court has not decided the federal constitutional claim (even by reference to state court decisions dealing with federal constitutional issues)"). Therefore, we reject amicus's argument that de novo review under

-23-

_Fortini_ applies here, and we apply § 2254's standard to the state appeals court's determination that McCambridge was not prejudiced by the prosecution's failure to disclose the conviction record.

## B. Standard of Review under § 2254

We turn to whether the state court holding that there was no prejudice "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

There is no argument that the state court decision is "contrary to" clearly established federal law. The Supreme Court has stated:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.

_Williams_ v. _Taylor_, 529 U.S. 362, 412-13 (2000) (O'Connor, J.). Here, the state court applied the proper rule of law by asking if the defendant was prejudiced, see _Strickler_, 527 U.S. at 281-82, and there is no Supreme Court case involving "materially indistinguishable facts" that is contrary to the outcome here. Rather, the debate centers on whether the state appeals court determination was an "unreasonable application" of the federal rule on prejudice to the facts of the case here.

_Williams_ made it clear that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle

-24-

from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413 (O'Connor, J.).  The Supreme Court further clarified that unreasonableness must be an objective standard, id. at 410, and that an erroneous or incorrect application is not necessarily an unreasonable application, id. at 411.

Some possible readings of "unreasonable application" are too severe: Williams indicates that the test is not whether it is possible that a competent court could have reached the same conclusion.  See  Hertz & Liebman, Federal Habeas Corpus Practice and Procedure, § 32.3, 1449 (4th ed. 2001) (noting that the Supreme Court in Williams found state supreme court decision to be an "unreasonable application" despite the fact that other courts had reached the same conclusion); see also Valdez v. Ward, 219 F.3d 1222, 1229-30 (10th Cir. 2000), cert. denied, 532 U.S. 979 (2001) ("[T]he fact that one court or even a few courts have applied the precedent in the same manner to close facts does not make the state court decision 'reasonable.'").

Some possible readings are too lenient: the mere fact that there was some error or that the state decision was incorrect is not enough. Williams, 529 U.S. at 411; Boss v. Pierce, 263 F.3d 734, 739 (7th Cir. 2001), cert. denied, 122 S.Ct. 1961 (2002); Cannon v. Gibson, 259 F.3d 1253, 1260 (10th Cir. 2001), cert. denied, 122 S.Ct. 1966 (2002); Tucker v. Catoe, 221 F.3d 600, 605 (4th Cir. 2000), cert. denied, 531 U.S. 1054 (2000); Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000).  The range for what is an

unreasonable application must fall somewhere between the two. Within that range, if it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application. We agree with the Second Circuit that "some increment of incorrectness beyond error is required." Francis S., 221 F.3d at 111. The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court. Id.

As Justice O'Connor noted in Williams, unreasonableness is "difficult to define," 529 U.S. at 410, but it is a concept federal judges apply in different contexts. "Reasonableness is a concept, not a constant." United States v. Ocasio, 914 F.2d 330, 336 (1st Cir. 1990). For example, the state court decision may be unreasonable if it is devoid of record support for its conclusions or is arbitrary. O'Brien v. Dubois, 145 F.3d 16, 25 (1st Cir. 1998).

To the extent prior opinions by panels of this court state a standard inconsistent with that articulated here, they are overruled. Thus, the standard recited in Williams v. Matesanz, 230 F.3d 421, 424 (1st Cir. 2000), and O'Brien v. Dubois, 145 F.3d 16, 25 (1st Cir. 1998) -- that "for the writ to issue, the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes" -- must be read to conform to these teachings. In light of Williams v. Taylor, we

-26-

think that the more stringent interpretation of § 2254 articulated in <u>O'Brien</u> and <u>Williams</u> v. <u>Matesanz</u> is not justified.

## C.  Prejudice Analysis

We apply this "unreasonable application" standard to the state appellate court's determination that there was no prejudice to McCambridge from the failure of the prosecutor to have produced the victim's record.  The Massachusetts Appeals Court based its no prejudice finding on two independent reasons.  There was no prejudice because 1) McCambridge was aware of the victim's record and was prepared to offer such evidence at trial; and 2) "[b]y convicting the defendant of manslaughter, the jury obviously credited the defendant's testimony that the struggle in the van was precipitated by the defendant's remark about this offense to Doyle."  690 N.E.2d at 475.  While some on the en banc majority think the state appeals court's first ground alone would be dispositive, we focus on the second ground, which all in the majority think clearly disposes of the petition.

Even assuming arguendo that the prosecutor should have turned over the conviction record, there is no prejudice under <u>Brady</u> and so no due process violation unless there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States</u> v. <u>Bagley</u>, 473 U.S. 667, 682 (1985) (plurality opinion). This has been referred to as the <u>Brady</u> prejudice or materiality standard; without it, there is no <u>Brady</u> violation. <u>Strickler</u>, 527 U.S. at 281-82.

-27-

The Supreme Court explained in Bagley that a "'reasonable probability' is a probability sufficient to undermine confidence in the outcome." 473 U.S. at 682; see also Kyles v. Whitley, 514 U.S. 419, 435 (1995) ("One . . . show[s] a Brady violation by . . . showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."); United States v. Agurs, 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."); United States v. Sepulveda, 15 F.3d 1216, 1220 (1st Cir. 1993) (discussing materiality in the context of Brady claims). At the same time, prejudice under Brady should not be equated with a sufficiency of the evidence standard, Kyles, 514 U.S. at 434-35, nor does it "mean that the reviewing court must be certain that a different result would obtain," United States v. Dumas, 207 F.3d 11, 15 (1st Cir. 2000).

Defendant and amicus argue that the only reasonable conclusion is that McCambridge was prejudiced sufficiently to warrant a new trial. They point to the prosecutor's closing comments,[6] saying he implied that Doyle was not convicted, after the prosecutor had not produced the conviction record and represented to the court there was no such conviction. They argue

_____

[6] For present purposes, we do not pass on the Commonwealth's arguments that McCambridge never objected to the prosecution's closing argument, or raised this as an independent issue in the state appeals court, and so has waived the issue.

-28-

that this was a close case on the evidence and ultimately hinged on McCambridge's credibility, which they argue was deeply wounded by the prosecutor's comment. As support for this, they say that Doyle's blood alcohol level, subcutaneous bleeding, and the medical technician's testimony that Doyle was still warm indicate that Doyle was shot shortly before the crash; that the blood and tissue samples on the passenger side door and windshield indicate that McCambridge was in the passenger's seat at the time of the crash; that there was a cocked gun with the safety off in the van; and that the boxes of ammunition in the car indicate that both guns belonged to Doyle. They also argue that the state appellate court's reasoning that "by convicting the defendant of manslaughter, the jury obviously credited the defendant's testimony that the struggle in the van was precipitated by the defendant's remark about [the conviction] to Doyle," 690 N.E.2d at 475, is arbitrary and unsupported by the record, because the jury convicted McCambridge of driving offenses and therefore clearly did not credit his testimony as to how the fight began.

The Commonwealth responds that, given the evidence presented to the jury, it was not unreasonable for the Massachusetts Appeals Court to conclude that, even if McCambridge had been able to corroborate his testimony with the conviction record and the prosecutor had not made his statement in closing, there was no "reasonable probability that . . . the result of the proceeding would have been different." Bagley, 473 U.S. at 682. The result in this proceeding was that McCambridge was acquitted of

-29-

first degree murder and convicted of manslaughter, so the question is whether there is a reasonable probability that the manslaughter verdict would have been different.

To assess that question, we first turn to the state trial court's extensive jury instructions, which we quote in relevant part below. The trial judge explained the Commonwealth's burden to prove that McCambridge did not act in self-defense:

> The Commonwealth must prove . . . that one or more of the three requirements of self-defense was absent from this case.
>
> . . . [T]hose three requirements are first that the defendant must have reasonably believed that he was being attacked or was immediately about to be attacked and that he was in immediate danger of being killed or seriously injured.
>
> Second, the defendant must have done everything that was reasonable under the circumstances to avoid physical combat before resorting to force and, third, that the defendant must have used no more force than was reasonably necessary in the circumstances to protect himself.

She also gave thorough instructions on how to differentiate manslaughter upon provocation from self-defense and the role of excessive force:

> Manslaughter is an unlawful, intentional killing resulting from a sudden transport of the passions of fear, anger, fright, nervous excitement or heat of blood when there is no time to deliberate and when such passion or heat of blood is produced by adequate or reasonable provocation and without malice or upon sudden combat it would have been likely to produce in an ordinary person an abnormal state of mind and actually did produce such a state of mind in the defendant.
>
> . . . .
>
> . . . The first element the Commonwealth must prove beyond a reasonable doubt is that the defendant inflicted an injury upon Mr. Doyle from which Mr. Doyle

died; second, that the defendant injured Mr. Doyle as a result of sudden combat or in the heat of passion or using excessive force in self-defense; and, third, that the homicide was committed unlawfully without legal excuse or justification.

The provocation sufficient to reduce an unlawful killing from murder to manslaughter is that provocation which would likely produce in the ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse a person's capacity for reflection or restraint and actually did produce such a state of mind in the defendant.

. . . .

Another factor or circumstance which mitigates or reduces murder to manslaughter is when a person kills using excessive force in self-defense. . . . Specifically, if the person initiated an assault against the defendant so that the defendant reasonably feared that he was in danger of being killed or suffering grievous bodily harm at the hands of Mr. Doyle, then the defendant has the initial right to use whatever means were reasonably necessary to avert the threatened harm. But, if the defendant used excessive force, that is, more force than was reasonable or proper under the circumstances of this case or the defendant, himself, became the attacker and the use of such force resulted in the death of his assailant, then that would constitute manslaughter.

After a few hours of deliberation, the jury asked for clarification on unlawful killing, malice aforethought, burden of proof, and reasonable doubt. The jury then asked for clarification on the definition of manslaughter. The judge re-read the manslaughter instructions that she had previously given.

Based on these instructions, the state appeals court reasonably concluded that the jury must have found that McCambridge was provoked in some way, resulting in a sudden heat of passion,

leading to physical conflict.[7]  That is what McCambridge himself said and the jury accepted his version.  The only evidence presented at trial regarding any possible provocation for the altercation was McCambridge's testimony that Doyle threatened him with the nine millimeter Smith & Wesson after McCambridge had called him a child abuser, and that a conflict ensued.  Thus the jury accepted McCambridge's story about Doyle's anger at being called a child abuser.  Nothing could be added to this by having the fact of the child neglect conviction established or admitted into evidence.

The state court also reasonably concluded that the jury necessarily found that McCambridge, in his self defense, used at least excessive force against Doyle (or that McCambridge turned into the attacker).  Neither the fact of Doyle's conviction, nor the contested excerpt from the prosecutor's closing argument, is material to whether McCambridge used excessive force.

The evidence overwhelmingly supports the jury's conclusion.  McCambridge shot Doyle twice, once in the face and once in the back.  The fact that Doyle was shot in the back is itself evidence of excessive force.  Before shooting the second shot, McCambridge had to cock the trigger of his gun again before

---

[7]  Under our analysis, it matters not whether the jury thought this was manslaughter due to a heat of passion or to sudden combat.  The defense did not differentiate (nor do the facts lend themselves to such differentiation) -- the defense's essential argument was that McCambridge did kill Doyle but he did it in self-defense when Doyle reached for the gun during their altercation and McCambridge's response was not excessive.  This brings the excessive force question into play.

firing.  This was not an automatic weapon, and the trigger pull was very heavy.  The forensic evidence was that Doyle had time to draw in at least a couple of breaths before the second shot, and McCambridge pulled back from an initial shooting distance of about six inches to a distance of about three feet for the second shot. There was also evidence that Doyle's head had been struck with a billy club, and a billy club with his blood-type on it was found. Even by McCambridge's account, the drunken Doyle was simultaneously attempting to drive the van down one of Boston's busiest highways, and so could not have been free to fully engage in the altercation. McCambridge himself said he had had at least some success in pushing Doyle's gun hand down and away, again supporting the conclusion that McCambridge used more force than was needed.

McCambridge makes an independent argument based on the other verdict.  We reject McCambridge's argument that because the jury convicted him of the motor vehicle charges, they necessarily rejected his testimony about the argument and how it developed, and so the conviction record would have made a difference.  The Appeals Court could reasonably conclude, supported by the expert testimony, that the jury concluded that once McCambridge shot Doyle, he pushed Doyle toward the back of the van and attempted to drive from the passenger's seat or the driver's seat.  Either act would suffice for the motor vehicle charges.  See Commonwealth v. Ginnetti, 400 Mass. 181, 508 N.E.2d 603, 605 (1987) (holding that, under Massachusetts statute criminalizing operating a motor vehicle under the influence and reckless operation of a motor vehicle, "a person

-33-

. . . operates a motor vehicle by starting its engine or by making use of the power provided by its engine").  See generally J. Pearson, Annotation, What Constitutes Driving, Operating, or Being in Control of Motor Vehicle for Purposes of Driving While Intoxicated Statute or Ordinance, 93 A.L.R.3d 7, § 6(a) (2002) (citing cases interpreting "operating" to include manipulation of controls from passenger's seat).  The state trial judge's instructions made it clear to the jury that an individual need not be seated in the driver's seat in order to be "operating" a vehicle within the meaning of the law.[8]  And there was evidence that McCambridge was in the driver's seat and sat in that seat after it was soaked with Doyle's blood.

The overall import of McCambridge's argument as to prejudice is that the prosecution's closing went to McCambridge's credibility, and that, in turn, impugned the verdict.  For a number of reasons, we think that the state court's conclusion that this did not impugn the verdict is not an unreasonable application of clearly established law.

---

[8]     The instructions were as follows:

A person operates a motor vehicle not only while doing all of the well-known and easily recognized things that drivers do as they travel along a street or highway but also in doing any acts which directly tend to set the vehicle in motion.  The law is that a person is operating a motor vehicle when he manipulates a mechanical or electrical part of the vehicle like the gear shaft or ignition which alone or in sequence will set the motor vehicle in motion.

What mattered for McCambridge's defense was not the truth of the fact of conviction itself, but rather the fact that the two had argued based on McCambridge's accusing Doyle of having abused a child, and the subsequent threat supposedly made by Doyle. McCambridge was allowed to testify as to this. McCambridge argues that the inevitable result was that he was discredited before the jury and even before his own attorney -- he posits that his attorney emphasized manslaughter in his closing, rather than self defense, because of the appearance that McCambridge had lied about the conviction story.

We take the analysis in stages. First, under Massachusetts law, the conviction record would not normally have been admissible, even as corroborative evidence. See Commonwealth v. Todd, 408 Mass. 724, 563 N.E.2d 211, 214 (1990) (holding that exclusion of victim's conviction record was not error in part because what was important for the defense was the defendant's belief, not the fact of the convictions); Commonwealth v. Fontes, 396 Mass. 733, 488 N.E.2d 760, 762 (1986) (holding that defendant may introduce specific instances of victim's violent conduct to support self-defense theory only if such instances are recent and known to defendant at the time of the homicide). Since the conviction was inadmissible, we are left with the prosecution's statement at closing. To the extent that the prosecutor attempted to imply that McCambridge was lying about the existence of a

conviction in his closing argument, an objection could have been made, but was not.[9]

Second, even if admissible, proof of the existence of the conviction was not material to the question of use of excessive force in self defense. As counsel for McCambridge had just said in his closing, there was no evidence one way or the other as to the conviction and this was not the point anyway. As the district court pointed out, an accusation of child abuse or molestation may be even more likely to provoke violent rage if it is baseless. Thus, as defense counsel suggested, it was the accusation of child abuse, whether true or not, which enraged Doyle.[10]

Third, the effect of the lack of evidence of a conviction and the prosecutor's statement was minimal given the wealth of evidence supporting the conviction. The contested statement in the closing argument comprises only one short paragraph in a sixteen-page transcript. The judge instructed the jury that nothing in the closing argument was to be considered as evidence. And there was

---

[9] The remedy at that point would have been an instruction to the jury to disregard the prosecutor's accusation. McCambridge's counsel could have requested this remedy even without the conviction record, since the court had already indicated that the question was McCambridge's state of mind. Of course, if the prosecutor had produced the conviction record as requested by McCambridge, he probably would not have ventured to accuse McCambridge of lying on this point, if that, contrary to how the trial transcript reads, is what he did.

[10] Indeed, the conviction, had it been available, might have undercut the defense, or at least it could be reasonably thought to do so. Doyle had been convicted of child neglect. Child neglect is shameful, but "child abuse," the term used by McCambridge, is a worse accusation. A false and worse accusation against Doyle could well lead to the conclusion that McCambridge was picking a fight and so the shooting was premeditated.

other evidence, particularly physical evidence, that undercuts McCambridge's credibility as to his assertion that he did no more than act properly to defend himself -- the blood evidence indicating that Doyle was shot at least five minutes before the van flipped; the fact that no witness reported gun flashes, although at least one witness watched for two minutes before the crash; the fact that Doyle had been shot more than once and most likely was also hit over the head with the bloodied billy club, which McCambridge could not explain; the fact that the weapon was found in McCambridge's clothes, apparently tucked in there after the shooting; the trooper's testimony that the van's driver smashed into the windshield and remained in the front area of the van; the evidence indicating that Doyle was thrown hard into the passenger side door and then out the bottom of that door, and was neither trapped in the driver's seat nor thrown into the windshield; the blood on the seat of McCambridge's jeans, most likely from the bloodied driver's seat cushion; and the fact that Doyle was already gray-blue when the troopers first saw him. The physical evidence, notably the blood patterns, was simply inconsistent with McCambridge's theory that the shootings occurred within thirty seconds. At most, the prosecutor's statement was another stab at the already damaged credibility of the defendant, who was most likely viewed as telling some, but not all, of the truth. Jurors need not believe everything a witness says, nor need they believe witnesses are not selective in recounting events. Daily life experience refutes any such belief. The physical evidence, too,

might well cause a jury to disbelieve McCambridge's convenient statement that he recalled everything up to the point he fired the first shot in self-defense, and recalled nothing after that. None of the arguments advanced by McCambridge "put[s] the whole case in such a different light as to undermine confidence in the verdict." Kyle, 514 U.S. at 435. Much less do these arguments lead us to conclude that the state court's judgment that there was no due process violation was unreasonable.[11]

Comparing the facts here with other cases, it is not unreasonable to conclude the Brady materiality/prejudice standard is not met. In United States v. Agurs, 427 U.S. 97 (1976), the defendant also claimed self-defense, and objected to the prosecution's failure to disclose the victim's criminal record. Id. at 100-01. The Court held that the non-disclosure "did not deprive [the defendant] of a fair trial as guaranteed by the Due Process Clause of the Fifth Amendment." The Court noted approvingly the trial judge's emphasis on the "incongruity" of a self-defense claim with "the evidence of [the victim's] multiple wounds and [the defendant's] unscathed condition"; the fact that the criminal record would not have contradicted any evidence offered by the prosecutor; and that the conviction record would be cumulative of evidence that the victim was armed with a knife at

_____

[11]     As discussed earlier, the closing argument transcript may be read as it is written, that the prosecutor said "There is absolutely evidence of that [conviction and earlier argument]," indicating that the prosecutor was not accusing McCambridge of fabricating the conviction, but only of fabricating the self-defense story. If the transcript is read that way, we still conclude that the conviction record was immaterial.

the time of the crime.  Id. at 113-14.  Moreover, in Agurs, the trial court and appellate court had assumed the conviction record would be admissible, id. at 100-02 & n.3, while in this case it was not.

In United States v. Dumas, this court considered a case in which the defendant claimed that he had been entrapped into a drug charge by his prison cellmate, and the prosecution failed to disclose evidence indicating that the cellmate had been put on suicide watch, and evidence that would corroborate the defendant's testimony as to how long the two had shared a cell.  207 F.3d 11, 13-15 (1st Cir. 2000).  Although the defense hinged on the defendant's credibility, we found that neither the corroborative nor the impeachment evidence was material for Brady purposes.  Id. at 16-17.

This court's decision in United States v. Udechukwu, 11 F.3d 1101 (1st Cir. 1993), does not assist McCambridge, much less does it show that the state court's decision was an unreasonable application of federal constitutional law.  In Udechukwu, the government, over objection, withheld evidence about a known drug trafficker, evidence that was favorable to the defendant.  In closing, the prosecution questioned the existence of the trafficker when the prosecution knew that he existed.  Id. at 1102-05.  The court did not reach the question of whether there was reversible error in the government's failure to disclose.  Rather, the court found a fatal taint from the prosecutor's "persistent theme in closing argument suggesting the nonexistence of this information --

-39-

and even the opposite of what the government knew." Id. at 1105. Here, in contrast, the prosecutor's closing had one line on this point; it was far from a persistent theme in a closing comprising sixteen pages of transcript. Here, the underlying information was not admissible. Here, in contrast to Udechukwu, there was no objection made to the prosecution's closing argument. And here it is far less clear that the failure involved government misconduct; rather, it was sloppiness. The prosecutor here had an incomplete report on which he relied. The prosecutor did not knowingly misrepresent to the jury. Udechukwu does not support McCambridge.

On habeas review, McCambridge faces a double hurdle -- showing both that there is a reasonable probability that the jury would have reached a different conclusion if it had the conviction record or if the prosecutor had not made the statement in the closing, and that the state appeals court determination on this point was unreasonable. Given the evidence here, he cannot clear either hurdle.

**Conclusion**

The petition for writ of habeas corpus is denied.

**-- Dissent follows. --**

-40-

**LIPEZ**, **Circuit Judge**, **with whom CYR**, **Senior Circuit Judge**, **joins**, **dissenting.** The Massachusetts Appeals Court rejected McCambridge's Brady claim on two grounds. See Brady v. Maryland, 373 U.S. 83 (1963). First, it ruled that McCambridge failed to object, as required, when the prosecutor refused to disclose the requested exculpatory evidence; namely, evidence of Doyle's conviction for child abuse. Second, the appeals court ruled that McCambridge could show no prejudice resulting from the prosecutor's wrongful suppression of that evidence. As a member of the panel that first reviewed this case, I concluded that the first ruling of the appeals court was contrary to clearly established federal law, and its second ruling constituted an unreasonable application of federal law. Despite the en banc proceedings and the thoughtful majority opinion, I continue to hold those views. I therefore respectfully dissent.

## I. Nondisclosure of Brady Material

The Supreme Court held as follows in Brady v. Maryland: "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The favorable evidence at issue here is the criminal record of the victim, Doyle.[1] McCambridge testified at trial that Doyle had

---

[1] The Commonwealth does not dispute that the evidence of Doyle's conviction was favorable to McCambridge.

-41-

become violent when McCambridge called Doyle a derogatory name that referred to Doyle's conviction for child abuse. McCambridge also described an incident a few months prior to their automobile accident when he asked Doyle whether he had been convicted of child abuse and Doyle threatened to kill McCambridge if he were ever to mention the topic again. Therefore, Doyle's criminal conviction related to McCambridge's theory of self-defense because it provided an explanation for why Doyle might have become violent in the van. Additionally, McCambridge's testimony regarding Doyle's earlier threat afforded a significant evidentiary basis for the jury to assess McCambridge's state of mind at the time of the shooting in determining whether McCambridge had been in reasonable fear of death or serious bodily injury.

In charging an unlawful killing, the Commonwealth assumed the burden of proving that McCambridge did not act in self-defense. See Commonwealth v. Reed, 691 N.E.2d 560, 563 (Mass. 1998). The jury might not have found McCambridge guilty of any wrongful killing if it could not reject, beyond a reasonable doubt, McCambridge's testimony that he reasonably perceived that he was in imminent danger of death or serious bodily harm. McCambridge's credibility on this self-defense claim and his perception of Doyle's alleged actions in the van and his earlier threat were thus potentially determinative of the verdict.

Doyle had, in fact, been convicted of and imprisoned for child neglect.[2] Yet, during trial, the prosecutor represented, both to defense counsel and the trial judge, that there was no such conviction on Doyle's official record.

## A. Requests, Representations, and Rulings Regarding the Exculpatory Evidence

The question of Doyle's record arose several times during the trial. There were three discussions at the bench. The first sidebar took place on the third day of the trial when Doyle's brother was testifying for the Commonwealth. Defense counsel informed the court and the prosecutor that McCambridge's testimony regarding the altercation in the van would refer to his understanding that Doyle had been convicted of child abuse. Defense counsel stated that he saw no reason to question Doyle's brother about the decedent's conviction unless the prosecutor intended to take the position that McCambridge was lying. The prosecutor responded that he had not yet decided whether he would challenge McCambridge's veracity regarding Doyle's conviction. Due to the prosecutor's ambivalence in this respect, the defense was unable to resolve, at this point, whether to question Doyle's brother about the conviction. Therefore, the court ordered that the witness be held over for possible later questioning by the

---

[2] Doyle's official record indicates that he was convicted of child neglect and was sentenced to two years, six months to be served and the remainder suspended, with the six month period of incarceration to be followed by a two year period of probation. McCambridge referred at trial to a conviction for child abuse. The Commonwealth does not argue that the abuse/neglect distinction has any bearing on its disclosure obligation.

defense. During this initial sidebar, the prosecutor was put on notice that the record of Doyle's conviction tended to exculpate McCambridge by corroborating McCambridge's anticipated testimony.

The second sidebar on the issue of Doyle's conviction occurred during defense counsel's direct examination of McCambridge. The prosecutor objected, on hearsay grounds, to McCambridge's reference to the conviction when he described the threat allegedly made by Doyle a month before the killing. The court overruled the prosecutor's objection on the ground that the testimony was not being offered for the truth of the conviction, but rather to establish McCambridge's state of mind with respect to his fear of being killed by Doyle. The prosecutor replied that he thought the prejudicial effect of the evidence outweighed its probative value. The following exchange took place:

> THE COURT: Do we have a conviction on this charge?
>
> DEFENSE: Do I have a certified copy of the conviction? I do not. But I assert that it is true, that he was convicted for this charge. . . . I don't think my brother can say to your Honor that, in fact, he was not convicted. I've read the newspaper articles about it.
>
> COURT: Has anyone checked his probation record?
>
> PROSECUTOR: It just says -- it doesn't say what for. I have no idea what it's for.
>
> COURT: Okay. I'll tell them that it's not being offered for the truth of the matter.[3]

---

[3] This jury instruction was never given.

The key event during the second sidebar was the prosecutor's representation that he had looked at Doyle's record but had found it to be unclear.

The question of the conviction arose again shortly after the second sidebar. Despite the court's ruling that the jury would be told that McCambridge's testimony regarding Doyle's conviction was not being offered for the truth of the matter, the prosecutor attempted to raise doubts about the fact of the conviction during his cross-examination of the defendant.

> PROSECUTOR: You said that you had an argument with Mr. Doyle sometime prior to this in September and you said that he was involved in a problem of child molestation; is that correct?
>
> DEFENDANT: I was told that. . . .
>
>          * * *
>
> PROSECUTOR: You know Mr. Doyle is deceased; isn't that correct, sir?
>
> DEFENDANT: He certainly is.
>
> PROSECUTOR: He can't refute your allegations right now; can he?
>
> DEFENSE: Objection to that, your Honor.
>
> THE COURT: Sustained.

This line of questioning foreshadowed the prosecutor's reference to Doyle's conviction in closing argument. It also explains the concern expressed by defense counsel at the third sidebar, held on the fourth day of trial just before the defense rested.

During this third and final sidebar, the court again asked the prosecutor whether he had checked Doyle's record and the defense

-45-

requested that the prosecution produce the record.  Defense counsel also referred to the possibility of recalling Doyle's brother to establish the conviction, while indicating once again that he would not do so unless the prosecutor intended to argue that McCambridge was lying about it:

> DEFENSE: He is maligning [the defendant's] character, you know, as if there is some evidence in the case that he [the victim] wasn't really in jail.
>
> PROSECUTOR: He wasn't in jail, Judge.
>
> THE COURT: Did you check his record?
>
> PROSECUTOR: He wasn't in jail, Judge.
>
> THE COURT:  Was he convicted?
>
> PROSECUTOR:  No.  No.
>
> DEFENSE:  Do you have his record?  Let's make it part of the --
>
> PROSECUTOR: No.  I'm not going to make it a part.  That's your case, sir. . . .  So, as far as I know, he's never been in jail a day of his life.

                              * * *

> DEFENSE: Your Honor, I don't have access to his criminal record. . . .  So if he's got a criminal record, this is an important issue, it seems to me.  I would like it produced so we can all see whether or not he did have a criminal record and what, if anything, he was convicted of.  I'm concerned about it.  I don't want to make it part of the case.  On the other hand, I don't want to open it up for argument that I didn't prove that he had one and, therefore, my guy was lying.

                              * * *

PROSECUTOR: . . . [A]s far as I know, there is no record that Mr. Doyle had any convictions.

THE COURT: What do you intend to argue?

PROSECUTOR: . . . I am going to argue the facts of the case, Judge. That's all I'm going to argue.

THE COURT: There's inferences the jurors may want to draw from those facts. Are you --

PROSECUTOR: But you can't draw an inference from something where there's no conviction of a guy. I mean, the guy [McCambridge] gets up there and says [Doyle's] done time when I know he hasn't from the records that I've seen. And, if he's got the records, he can --

THE COURT: But this was offered really for state of mind, not for the truth of it, not as to whether or not he did, in fact, do any time or anything like that. Therefore, I don't know if it's appropriate to argue whether he did or he didn't. I am allowing it only for the state of mind of the defendant.

PROSECUTOR: Then that's all I'm going to argue, Judge.

At the third sidebar, defense counsel expressed a willingness to keep proof of the existence of the conviction out of the case in compliance with the judge's ruling. However, he also voiced concern that the prosecutor would use the absence of evidence confirming the conviction to cast doubt upon McCambridge's credibility. In addition, defense counsel directly asked the prosecutor for Doyle's record.

During these sidebar discussions, the prosecutor made two kinds of statements about Doyle's criminal record. First, the

-47-

prosecutor made qualified statements that Doyle had no criminal record by saying, "as far as I know."  However, at other moments, the prosecutor more definitively denied that Doyle had been convicted by answering the court's questions with a simple "No, no" or saying, "I know he hasn't [been convicted] from the records that I've seen."

Doyle's criminal record was in the Criminal Offender Record Information System (CORI) of Massachusetts.  A person's CORI report lists his or her court appearances and convictions, if any.[4]  The Commonwealth has represented that at trial the prosecutor had only the first page of Doyle's three-page CORI report; the relevant conviction appears on the second page.[5]  The Commonwealth argues that it did not violate the requirements of Brady for three reasons.  First, it says that the prosecutor disclosed all the information he had about Doyle's criminal record because the

---

[4] CORI reports are kept by the Criminal History Systems Board of Massachusetts. The Board is responsible for collecting and organizing criminal offender record information. See Mass. Gen. Laws ch. 6, § 168 (2000). The Board is comprised of several law enforcement officials and associations.  Private users of the system, victims of crime, and experts in personal privacy issues are also represented.  The Board serves as a centralized repository for criminal record information and may disseminate information only to criminal justice agencies, agencies required to have access by statute, and other agencies or individuals "where it has been determined [by the Board] that the public interest in disseminating such information to these parties clearly outweighs the interests in security and privacy." Id. at § 172.

[5] The Commonwealth has not contended (nor did the trial court suggest) that the defense had access to Doyle's CORI report in the absence of a court order or cooperation by the prosecution. Massachusetts law permits dissemination of these records only to agencies and individuals that the Board has certified. See Mass. Gen. Laws ch. 6, § 172.

incomplete CORI print-out did not indicate that Doyle had ever been convicted of child abuse. Second, the Commonwealth contends that McCambridge should have been more diligent in requesting that the record be produced. Finally, the Commonwealth argues that McCambridge was required to object to the prosecutor's nondisclosure of Doyle's criminal record.[6]

### 1. Evidence in the possession of the government

Under well-settled law, a prosecutor's duty to disclose exculpatory evidence extends beyond his or her personal knowledge of such evidence. See Kyles v. Whitley, 514 U.S. 419, 437 (1995) (describing the prosecutor's duty "to learn of any favorable evidence known to the others acting on the government's behalf in the case"). This duty exists because the prosecutor is the representative of the government in proceeding against a defendant in a criminal case. See Giglio v. United States, 405 U.S. 150, 154 (1972) ("The prosecutor's office is . . . the spokesman for the Government."). Therefore, a state prosecutor may be held accountable, in appropriate circumstances, for the nondisclosure of Brady material in the possession of a state agency without regard to the prosecutor's personal knowledge of the existence of that material. See Strickler, 527 U.S. at 282 (discussing nondisclosure of Brady material "known to the Commonwealth" but apparently not to the prosecutor); United States v. Agurs, 427 U.S. 97, 111 (1976).

---

[6] In its brief to the en banc court the Commonwealth focuses on the second and third arguments.

While the above cited cases involved evidence known to the police, their logic applies to the present case as well, since Doyle's criminal record was in the CORI database maintained by the Commonwealth. The prosecutor requested Doyle's criminal record from the Board, an agency established to coordinate the exchange of information among law enforcement personnel, including prosecutors and police officers. Based on the information he received from the Board, the prosecutor made inaccurate representations to the court and to the defense that Doyle had no criminal record. Under these circumstances, the Commonwealth is responsible for the nondisclosure regardless of the prosecutor's actual personal knowledge. See Kyles, 514 U.S. at 437-38 (holding that a prosecutor's ignorance of exculpatory evidence not produced by a state agency does not insulate the government from responsibility for a Brady violation). Accordingly, the prosecutor's statement that Doyle had no criminal record "as far as I know" does not relieve the Commonwealth of its obligations under Brady and its progeny because the prosecutor's personal awareness of Doyle's conviction is irrelevant.

**2. Defense obligation to request exculpatory evidence**

The Commonwealth argues that defense counsel should have filed a formal discovery request for Doyle's criminal record. There is no legal support for this contention. Brady obligations apply independently of any request by the defense. See Strickler, 527 U.S. at 280 ("[T]he duty to disclose [exculpatory] evidence is applicable even though there has been no request by the accused.")

-50-

(citing Agurs, 427 U.S. at 107). The prosecutor in this case was on notice from the time of the first sidebar conference that evidence substantiating McCambridge's claim that Doyle had a criminal record would be favorable to McCambridge's theory of self-defense. There was no need for McCambridge to request that evidence specifically.

The Commonwealth also asserts that it was not obligated to disclose evidence of Doyle's conviction because the defense could have found that evidence through a reasonably diligent investigation. See, e.g., United States v. Rodriguez, 162 F.3d 135, 147 (1st Cir. 1998) ("The government has no Brady burden when the necessary facts . . . are readily available to a diligent defender."). However, as noted, McCambridge could not access the CORI database without a court order. See Mass. Gen. Laws ch. 6, § 172. Moreover, the Commonwealth's argument about the ready availability of evidence misses the point in an important way. This was not a case where the defense simply refused to look for evidence it knew existed and relied on the prosecution to disclose that evidence. Rather, the prosecutor misrepresented, to both defense counsel and the court, that the exculpatory evidence did not exist. Defense counsel was entitled to rely on that representation. See Strickler, 527 U.S. at 283 n.23. Under these circumstances, McCambridge was not obligated to inquire further.

The Commonwealth argued before the panel that the prosecutor's statements that Doyle had no criminal record "as far as I know" should have alerted defense counsel to the possibility

that such a record did exist but was simply not personally known to the prosecutor. Because the prosecutor expressed this uncertainty, the Commonwealth asserted, McCambridge and his counsel should have been more diligent in confirming whether the prosecutor's qualified statements were, in fact, true. The Commonwealth cites no authority for this argument, and I have found none. Under well-settled law, as I have explained, <u>Brady</u> obligations apply to a prosecutor's conduct even when the defense has not sought discovery of the exculpatory evidence. See <u>Strickler</u>, 527 U.S. at 280; <u>Agurs</u>, 427 U.S. at 107. Moreover, McCambridge's counsel reasonably relied upon the prosecutor's representations that Doyle had never been convicted, <u>see</u> <u>Strickler</u>, 527 U.S. at 283 n.23, and because the prosecutor was acting in his capacity as representative for the government, <u>see</u> <u>Kyles</u>, 514 U.S. at 437, defense counsel was also reasonable in concluding that the prosecutor's denials indicated that such evidence of a conviction did not exist.

**3. Requirement to object to the nondisclosure of exculpatory evidence**

Finally, the Commonwealth argues that McCambridge was required to object to the prosecutor's inaccurate representation about Doyle's record, despite <u>Strickler</u>'s holding that "defense counsel may reasonably rely" on a prosecutor's representation that she has complied fully with <u>Brady</u>, <u>Strickler</u>, 527 U.S. at 283 n.23, thus rendering unnecessary an objection to the nondisclosure of that evidence. In <u>Strickler</u>, the prosecutor maintained an "open file" policy, meaning that "his entire prosecution file was made

-52-

available to the defense." Id. at 283 n.22. While it is not clear from the record whether the Commonwealth maintained an open file policy in this case, the prosecutor's statements to defense counsel and to the court that Doyle had no criminal record constitute essentially the same representation at issue in Strickler: that the prosecution had fulfilled its constitutional duty under Brady. Under such circumstances, defense counsel is not required to object. Indeed, the Supreme Court rejected such a requirement in Strickler:

> "The presumption, well established by tradition and experience, that prosecutors have fully discharged their official duties, is inconsistent with the novel suggestion that conscientious defense counsel have a procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred."

Strickler, 527 U.S. at 286-87 (citation and internal quotation marks omitted).

The Commonwealth has argued, again, that the prosecutor's occasional use of the words "as far as I know" excuses its failure to disclose the exculpatory evidence because such equivocal language should have indicated to the defense that a specific objection to the nondisclosure was necessary. This argument is unpersuasive for the same reasons it was unpersuasive in the context of McCambridge's failure to pursue a more thorough investigation of Doyle's criminal record: the Commonwealth cannot escape its Brady obligations by qualifying its nondisclosure of exculpatory evidence and then shifting its disclosure burden to

-53-

defense counsel.  Moreover, the potential mischief invited by the Commonwealth's argument provides strong reason for rejecting it.

**B. The state court decision**

McCambridge argued to the Massachusetts Appeals Court that the prosecution did not fulfill its disclosure obligations under <u>Brady</u>.  For example, he stated in his opening brief:

> The suppression of material evidence favorable to the accused and requested by him violates the due process clause of the Fifth Amendment. <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83, 87 (1963).  In the case at bar, because the trial court refused to require the Commonwealth to produce Doyle's criminal record, the defendant cannot prove that exculpatory evidence was withheld.  The defendant did everything he could to preserve this issue.  Compare this case with <u>Commonwealth</u> v. <u>O'Brien</u>, 419 Mass. 470, 477 (1995).  Thus, this Court should order the Commonwealth to produce Doyle's criminal record so that an appellate decision can be made.  In the alternative, the case should be remanded to the Superior Court for production of the document at issue.
>
> If Doyle had a criminal record as described by the defendant at trial, then the withholding of that information and the misleading of the defense was intentional and prejudicial. <u>See</u> <u>Commonwealth</u> v. <u>Tucceri</u>, 412 Mass. 401 (1992).  A new trial would be required.

As this passage from McCambridge's brief reveals, he articulated a claim under <u>Brady</u>, with appropriate citations, and argued that the prosecutor's nondisclosure of Doyle's record -- if the record indeed existed -- prejudiced him.

The prosecution finally disclosed Doyle's criminal record after McCambridge filed his brief to the appeals court.  Following

-54-

the Commonwealth's belated disclosure, McCambridge refined his

Brady argument in his reply brief:

> In United States v. Bagley, 473 U.S. 667 (1985), the Supreme Court recognized that an incomplete response to a specific request for disclosure not only deprives the defense of the specific evidence, but also suggests to the defense that such evidence does not exist. The defense's reliance on such a misleading representation can result in important changes in trial strategy. In the case at bar, the defendant was specifically misinformed about Doyle's criminal record. The defendant then gave up his strategy of attempting to elicit information about that record from Doyle's brother or the Clerk of the Norfolk Superior Court. The prosecutor fully exploited his misrepresentation in closing argument.
>
> The state constitutional and/or common law standard for a Brady violation does consider the issue of bad faith. See, Commonwealth v. Tucceri, 412 Mass. 401 (1992). Where bad faith has been demonstrated, and the withheld evidence might have affected the outcome of the trial, the defendant is entitled to a new trial. In the absence of bad faith, a new trial is necessary if the withheld evidence would have been a real factor in the jury's deliberation. In the case at bar, the defendant's truthfulness about the circumstances of his confrontation with Doyle was the central issue in the case. The blocking of the Commonwealth's claim, that the so-called argument about Doyle's child abuse record was only the defendant's attempt to assassinate Doyle's reputation, would have been a real factor in the jury's deliberation, and probably would have tipped the scales in favor of the defendant.

Again, McCambridge identified the proper legal authority for his

Brady claim and explained why he was prejudiced by the prosecutor's

failure to fulfill his disclosure obligations.

McCambridge's Brady claim was thus fully presented to the

Massachussets Appeals Court. In its opinion affirming

-55-

McCambridge's conviction and sentence, the appeals court addressed the issue of Doyle's record only briefly: "While the defendant pressed for the introduction of the victim's criminal record at trial, he did not object when the judge did not order its production or request that the record be marked for identification. He cannot now be heard to complain that the judge failed to do so at the sentencing stage." McCambridge, 690 N.E.2d at 475. The court did not seem to recognize the Brady implications of Doyle's criminal record - despite McCambridge's argument on the issue in both his opening and reply briefs.

Under the new standard for federal habeas review, we must examine the state court determination of McCambridge's Brady claim to determine whether it is contrary to or an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d)(1). The Supreme Court has said the following with respect to the "contrary to" prong of § 2254(d)(1):

> The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. . . . A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.

Williams v. Taylor, 529 U.S. 362, 405-06 (2000). The Massachusetts Appeals Court did not explicitly identify a legal rule in finding

-56-

that McCambridge could not "now be heard to complain" about the nonproduction of Doyle's record because he did not object when the trial court judge failed to order its production. McCambridge, 690 N.E.2d at 475. However, implicit in this reasoning is a legal rule that would require a criminal defendant to object to the prosecution's nondisclosure of exculpatory evidence where the prosecution has represented that such evidence does not exist. Strickler, however, held that defense counsel is not required to object to the nondisclosure of exculpatory evidence where the prosecutor has represented that she has discharged fully her Brady obligations. Strickler, 527 U.S. at 289. Accordingly, the opinion of the Massachusetts Appeals Court denying McCambridge's Brady claim, in part, because he failed to object at trial is contrary to clearly established federal law as determined by the Supreme Court.

## C. Adequate and Independent State Ground

The Commonwealth further maintains that our review of McCambridge's habeas petition is precluded because there is an adequate and independent state ground for the state appeals court decision. Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991). Noncompliance with a state procedural rule may preclude federal review: "The [adequate and independent state ground] doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the

prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on independent and adequate state procedural grounds." Id. at 729-30. In this case, the Commonwealth contends that the appeals court's reliance on the Massachusetts rule requiring contemporaneous objections provides such an adequate and independent state ground.

I have already indicated that I would reject the Commonwealth's argument that McCambridge had an obligation to object to the government's failure to disclose Brady material. As I have explained, there is no such obligation under federal law. Indeed, the Commonwealth has not identified any authority supporting its assertion that McCambridge was required to object. My own review of Massachusetts caselaw has unearthed no case -- except for the decision of the appeals court in this case -- requiring an objection to the inaccurate representation by a prosecutor that exculpatory evidence sought by the defense has been disclosed. See, e.g., Commonwealth v. Hill, 739 N.E.2d 670 (Mass. 2000); Commonwealth v. Tucceri, 589 N.E.2d 1216, 1224 (Mass. 1992). For a state procedural rule to constitute an adequate and independent state ground barring federal habeas review, that rule must be consistently enforced in the state courts. See Moore v. Ponte, 186 F.3d 26, 32-33 (1st Cir. 1999). Even if a Massachusetts procedural rule requiring an objection to the nondisclosure of exculpatory evidence had been consistently enforced, such a rule would be unconstitutional under Strickler. Accordingly, there is no adequate and independent state ground supporting the decision of

the Massachusetts Appeals Court that precludes our review of McCambridge's claim.

## II. Prejudice

The conclusion that the ruling by the appeals court requiring an objection to the prosecutor's nondisclosure is contrary to clearly established federal law does not end the Brady inquiry. Brady established both a rule of conduct - that prosecutors must disclose exculpatory evidence in the possession and control of the government - and a standard of prejudice that petitioners must meet in order to obtain relief for a prosecutor's failure to comply with that rule. See Strickler, 527 U.S. 281-82 (noting elements of a Brady claim). Accordingly, it is also necessary to assess whether the appeals court erred in its determination of prejudice under Brady, and if so, whether that erroneous determination constituted an unreasonable application of clearly established federal law.

To prevail on his Brady claim, McCambridge must show that he was prejudiced by the prosecutor's failure to disclose the evidence of Doyle's criminal record. More specifically, he must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he

-59-

received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Strickler, 527 U.S. at 289-90. See also United States v. Josleyn, 206 F.3d 144, 152 (1st Cir. 2000). That there was sufficient evidence on which to convict McCambridge does not establish that his trial was fair. See Kyles, 514 U.S. at 435.

It seems improbable that, standing by itself, McCambridge's inability to corroborate his testimony through the introduction of Doyle's conviction would have had an effect on the jury's verdict. However, as McCambridge has argued consistently, the prosecutor's summation, exploiting his misleading disclosure about Doyle's conviction, seriously prejudiced his case.

Immediately after the third sidebar, the defense rested and the parties made their closing arguments,[7] the pertinent parts of which follow:

> DEFENSE:
> Now, I want to talk about one other thing that's not evidence in this case. Mr. McCambridge told you on the stand the reason that he and Mr. Doyle got into the fight, besides that they were both drinking and probably neither one thinking with great clarity, there had been an incident a couple of months previously where Mr. McCambridge says he had been told something about Mr. Doyle and confronted him with it.
> The Judge admitted that evidence as evidence of Mr. McCambridge's state of mind; in other words, it's not evidence that Mr. Doyle ever did anything. There is no evidence in this case that Mr. Doyle ever molested or abused any child. . . . There is also no evidence in this case that he did it. There is simply no evidence in this case one way or

---

[7] Massachusetts Rule of Criminal Procedure 24(a)(1) provides that "the defendant shall present his closing argument first."

-60-

the other. You don't know as you sit here whether what transpired, what Mr. McCambridge says transpired between the two of them, has any backing in reality or not. There is no evidence. There is no evidence that he did it. There is no evidence that he didn't do it. It was admitted for a different purpose, which was the state of mind.

Now, you have to decide whether or not something like that could cause that explosion in the car, that eruption of bad blood when people had been drinking. Mr. McCambridge told you that he made some comment to this person that enraged him, and he had been threatened before.

* * *

PROSECUTION:

Does the defendant have something for you to believe when he gets up there and says, oh, yeah, I had an argument with Richard Doyle because of child molestation? There is absolutely evidence of that.[8] Was that put in there to tell you what his frame of mind was? No. <u>That was his third shot at the victim from the stand, assassinating his reputation with no evidence. That's what that was for, I suggest to you, not to show state of mind</u>.

In compliance with the ruling of the judge, the defense argued in its summation that whether or not Doyle had in fact been convicted of child abuse was not at issue in the case, the testimony about Doyle's conviction having been admitted only to establish McCambridge's state of mind. In marked contrast, the prosecutor ignored the court's ruling, as well as his representation that he

---

[8] I have reproduced the prosecutor's argument as it appears in the transcript of the trial as set forth in the record. Given the thrust of the prosecutor's argument, I assume that either the court reporter or the prosecutor unintentionally omitted the word "no" before the word "evidence" in this sentence. Although the majority suggests that the transcript should be read as written, the Commonwealth conceded in its brief to the panel that the prosecutor either said or intended to say "absolutely <u>no</u> evidence."

would abide by that ruling, and used the absence of the exculpatory evidence he had failed to produce to impugn McCambridge's credibility. For reasons that are not clear from the record, defense counsel did not object to the prosecutor's closing argument. Normally, such an omission by defense counsel would warrant requiring McCambridge to show cause for his failure to object and prejudice from the prosecutor's closing argument. However, I conclude that the Commonwealth failed to raise the issue of McCambridge's procedural default below and has thus waived that argument.

## A. Waiver of Waiver

Massachusetts has a "routinely enforced, consistently applied contemporaneous objection rule" regarding improper closing argument. Burks v. DuBois, 55 F.3d 712, 716 (1st Cir. 1995). Absent a timely objection, Massachusetts courts will not review appellate claims of improper summation unless cause and prejudice are demonstrated, except to ensure that a miscarriage of justice does not occur. See Commonwealth v. Stote, 739 N.E.2d 261, 268 (Mass. 2000). When the Massachusetts courts apply the procedural default rule, federal review of an improper summation claim is similarly foreclosed because failure to observe state procedural rules can constitute an adequate and independent ground for the state court decision. Palmariello v. Superintendent of M.C.I. Norfolk, 873 F.2d 491, 493 (1st Cir. 1989).

The Commonwealth did not argue in the federal district court that McCambridge procedurally defaulted by not objecting to

the prosecutor's closing argument.[9]  Indeed, even after receiving three extensions of time to file a brief in the federal district court, the Commonwealth failed to file a timely brief.[10]  "[T]his circuit religiously follows the rule that issues not presented to the district court cannot be raised on appeal."  Ouimette v. Moran, 942 F.2d 1, 12 (1st Cir. 1991).

Moreover, litigants in federal habeas proceedings arising from state court convictions are generally required to raise all issues in the state courts.  See Trest, 522 U.S. at 89; Coleman, 501 U.S. at 732 (noting that the independent and adequate state ground doctrine "ensures that the States' interest in correcting their own mistakes is respected").  In this case, the Commonwealth

_____

[9] In its brief to the panel, the Commonwealth, for the first time, did note in passing that there was no objection to its summation, but it did not mention the possibility of a procedural bar to federal habeas review. The summation issue was disposed of in one paragraph. "There is also no merit to the petitioner's contention that he was prejudiced by the prosecutor's reference during closing argument to the fact that the victim's criminal record was not in evidence.  Defense counsel, during his closing, had already expressly conceded this point by stating: 'There's no evidence in this case that Mr. Doyle ever molested or abused any child.'  In any event, the petitioner did not object to the prosecutor's closing and the judge instructed the jury that counsel's arguments were not evidence." This statement is patently insufficient to raise an adequate and independent state ground argument with respect to the failure of the defendant to object to the Commonwealth's closingargument. See United States v. Fernandez, 145 F.3d 59, 63 (1st Cir. 1998) (issues mentioned in perfunctory manner, unaccompanied by argument, are deemed waived); Fed. R. App. P. 28(b).  Nor can the Commonwealth raise the issue for the first time before the en banc court.  See Kale v. Combined Ins. Co., 924 F.2d 1161, 1169 (1st Cir. 1991) (stating that a party cannot raise an issue for the first time on rehearing en banc).

[10] Despite not receiving permission to file a brief after the expiration of the final deadline, the Commonwealth did so. We assume it was not considered by the district court.

did not argue procedural default in any state proceedings. "[P]rocedural default is normally a defense that the State is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter." Trest, 522 U.S. at 89 (internal quotation marks omitted); see also Commonwealth v. LaBriola, 722 N.E.2d 13, 14 n.1 (Mass. 2000). We should enforce that rule here.

## B. State court decision

Next I examine the opinion of the Massachusetts Appeals Court to determine whether its conclusion that McCambridge was not prejudiced by the nondisclosure of the exculpatory evidence is contrary to or an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d)(1). On the prejudice issue, the appeals court said the following:

> In any event, assuming without deciding that the prosecutor should have produced the victim's record, there was no prejudice to the defendant because he was aware of the victim's record and was prepared to offer such evidence at trial. Moreover, by convicting the defendant of manslaughter, the jury obviously credited the defendant's testimony that the struggle in the van was precipitated by the defendant's remark about this offense to Doyle. See Commonwealth v. Tucceri, 412 Mass. 401, 412-414, 589 N.E.2d 1216 (1992).

I accept the majority's conclusion that the Massachusetts Appeals Court applied a standard of prejudice that is consistent with Brady, and that its decision was thus not contrary to federal law. However, I would hold that the state court's conclusion on prejudice is an unreasonable application of the Brady prejudice

standard.  To explain, I describe the evidence presented at McCambridge's trial.

## 1. The evidence

The prosecution alleged at trial that McCambridge shot and killed Doyle shortly after the two men left a bar in Cambridge at 1 a.m., and that McCambridge was driving, with Doyle's body in the back of the van, when a state trooper tried to stop the van. The prosecution further alleged that the van crashed when McCambridge reached for a gun with which he intended to shoot the police officer attempting to apprehend him.  However, the evidence the Commonwealth presented at trial to prove this theory was conflicting and inconclusive.

### a. Time of death

The doctor who performed the autopsy on Doyle testified that Doyle had last consumed alcohol approximately one and one half hours before his death.  It is undisputed that Doyle and McCambridge left the bar when it closed at 1 a.m. and that the accident occurred at about 2 a.m.  Thus, if credited by the jury, the doctor's uncontradicted opinion tended to diminish any possibility that Doyle's death occurred much before the crash occurred, let alone just after the two men left the bar at 1 a.m. Another prosecution witness, an EMT who responded to the accident, testified that Doyle's skin was still warm when his body was found pinned beneath the van, thus tending to establish that Doyle died not long before the accident, particularly in light of the uncontradicted testimony that it was cold that night.

## b. The weapons

The evidence was also inconclusive with respect to McCambridge's ownership of and possession of a gun. The prosecution tried and failed to establish that McCambridge was carrying a gun in the waistband of his pants before he was in the van. The bartender testified that McCambridge became angry when the bartender started to close up the bar. He said that McCambridge stood up and brushed up against him, chest to chest, while pushing his coat back. When asked by the prosecutor whether he saw McCambridge "reach for anything," the bartender said no. The bartender also testified that McCambridge did not seem to be angry with Doyle when the two men left the bar.

A firearms officer testified that McCambridge shot Doyle twice with a derringer. When emergency personnel were removing McCambridge's jacket after the accident, the derringer fell to the floor of the ambulance. However, the firearms officer did not trace the derringer to establish who owned it. Nor did he attempt to identify the owner of the 9 mm. pistol with which Doyle allegedly had threatened McCambridge. Another Massachussetts police officer testified that a box of ammunition fitting one of the two guns was found in the van. However, the box of ammunition, labeled "Big Al's Gun Shop," was never introduced into evidence and the police officer had no other information about it.

## c. Location of the bodies

In an effort to bolster its theory that McCambridge had killed Doyle up to an hour before the accident, the prosecution

attempted to establish that McCambridge was driving when the van crashed. Forensic witnesses testified that blood on the seat of McCambridge's pants was consistent with Doyle's blood, supporting an inference that McCambridge sat in the driver's seat at some point. However, there was also evidence that there was not enough blood on his pants to suggest that he sat there for long.

There was other conflicting evidence about the probable location of McCambridge's body and Doyle's body at the time of the accident. A prosecution witness testified that: (1) the passenger-side window was broken; (2) glass from the passenger-side window was found on McCambridge's collar and under his jacket but none was found on Doyle; and (3) if someone had been sitting in the passenger seat at the time of impact, he would have been thrown to the right into the windshield or the passenger-door window. The prosecution offered no explanation as to how or why, under its theory of the case, McCambridge might have been in the passenger seat at the time of the impact.

The defense tried to show that it was not clear where the two bodies had been located prior to the crash and roll-over. The defense accident reconstructionist testified that the driver of the van could have been thrown between the bucket seats and out of the side door when the van was lifted into the air. The evidence was undisputed that after the accident the sliding door on the passenger side of the van was off its bottom hinges. The witnesses were in agreement that Doyle had been thrown from the car through this doorway. Because the fabric of Doyle's sweater had actually

-67-

fused to the van, one investigator testified that Doyle's ejection must have been the result of a major impact that generated the heat necessary to accomplish the fusion.  This evidence indicated that Doyle could have been driving at the time of the crash, and did not establish whether Doyle, if he had not been driving, was placed in the back of the van by McCambridge prior to the accident or was thrown there upon impact.

Police officers, emergency medical personnel and civilians agreed that McCambridge was found wedged in the driver's seat area. Yet blood and hair sample tests established, without contradiction, that McCambridge's head hit the passenger side of the windshield during the crash.  Uncontradicted testimony also established that McCambridge had a gash in his head and was covered with blood when he was found.

### d. The police investigation and handling of evidence

There were other questions left unanswered by the investigators.  The accident reconstructionist for the state police had no photographs of the tire marks on the road and could not explain the absence of such important and apparently routine evidence.[11]  He also admitted during cross-examination that he had made mistakes in drawing the accident scene; he was unsure what one line was intended to indicate and a second line purporting to represent the track of one tire in fact traced the track of a

---

[11] The defense expert testified that it was difficult to analyze the accident without a picture of the road marks and that it was standard procedure to carefully record such marks.

different tire.  Like the forensic chemist, he became confused regarding the physical principles governing the direction the bodies would have moved when the van hit the barrier.

Another state investigator failed to document where things were located before they were removed from the van by the police.  She was unaware of any inventory that might have been made of the "heaps of stuff" that had been in the van, which included trash bags, clothing, newspapers and debris.  She also stated that the nine millimeter gun, which was loaded and cocked and allegedly used to threaten McCambridge, was found under a great deal of debris.  Although the prosecution alleged that the van was weaving because McCambridge was reaching for this same gun in order to shoot the trooper who was trying to pull him over, there was no testimony as to whether the debris would have been on top of the gun before the crash or whether the gun itself would have moved during the crash.  Moreover, the investigator could not say whether bloodstains of Doyle's blood type found in the back of the van were recent or even whether they had been made by the police as they removed items from the van.  Some of the items that had fallen onto the road during the crash had been thrown back into the van before it was towed away, thus risking contamination and making it harder yet to reconstruct the accident.

### e. Self-Defense

In support of his self-defense claim, McCambridge testified that Doyle became aggressive after McCambridge called him a name referring to his conviction for child abuse.  He also stated

-69-

that he remembered nothing after the first shot he fired at Doyle until three to four days later when he was in the hospital. However, a medical expert, called by the defense, explained that a person might become more aggressive after receiving the type of wound Doyle received when hit by the first bullet. Dismissing McCambridge's amnesia as "convenient," the prosecutor called no medical experts to challenge the inference that such a memory loss could be attributed both to shock and to the serious head wound McCambridge sustained in the accident. Other than McCambridge's own testimony, the record is devoid of evidence bearing on whether McCambridge was in reasonable fear of serious bodily injury or death when he shot Doyle.

### 2. The verdict

The jury began deliberating at approximately 1:30 p.m. and returned its verdict the afternoon of the following day.[12] At the end of the first day of its deliberations, the jury requested clarification on (1) unlawful killing, (2) malice aforethought, (3) burden of proof and (4) reasonable doubt. The following day, the jury asked the trial judge to clarify the elements of the manslaughter charge. That afternoon, the jury returned a verdict finding McCambridge guilty of the crime of manslaughter, unlawful possession of a firearm, operating under the influence, and operating to endanger.

---

[12] It is unclear from the record at what time the jury was dismissed for the evening on the first day, at what time it reconvened on the second day, or at what time it rendered its verdict on the afternoon of the second day.

In returning a verdict of manslaughter, the jury rejected the prosecutor's theory that McCambridge acted with either premeditation or malice aforethought. Its rejection of the murder charge left the jury with only two options on the charge of unlawful killing: manslaughter or acquittal. The prosecutor's insinuation that McCambridge fabricated his testimony about Doyle's conviction to besmirch Doyle's reputation was the last thing the jury heard from either counsel. This improper undermining of McCambridge's credibility on the determinative question of self-defense, and perhaps of his credibility in general, may well have tipped the balance in favor of a manslaughter conviction. Thus, I conclude that there is a reasonable probability that the outcome of McCambridge's trial would have been different if the existence of Doyle's conviction had been disclosed and the prosecutor had not suggested in closing argument that McCambridge was fabricating Doyle's conviction.

The majority disagrees with this prejudice analysis. To convict McCambridge of manslaughter, the majority reasons, "the jury must have found that [he] was provoked in some way, resulting in a sudden heat of passion." The majority observes that "[t]he only evidence presented at trial regarding any possible provocation for the altercation was McCambridge's testimony that Doyle threatened him with the nine millimeter Smith & Wesson after McCambridge had called him a child abuser and that a conflict ensued." Thus, for the majority, "the jury necessarily found that McCambridge, in his self defense, used at least excessive force

-71-

against Doyle (or . . . turned into the attacker)."  The majority concludes that "the jury accepted McCambridge's story about Doyle's anger at being called a child abuser.  Nothing could be added to this by having the fact of the child neglect conviction established or admitted into evidence."

In my view, this reasoning is unduly speculative.  It assumes that if the jury convicted McCambridge of manslaughter, it must have believed his account of how the altercation with Doyle began.  However, as the amicus explains:

> The jury could have disbelieved petitioner almost entirely, thus rejecting his self-defense testimony, and still found him guilty of manslaughter rather than murder.  There was evidence outside petitioner's testimony that a struggle was occurring inside the van while driving on the highway shortly before the accident.  Drivers saw the van rocking back and forth on the highway, and forensic evidence indicated that Doyle was shot shortly before the crash.  There was independent evidence supporting petitioner's testimony that Doyle had pointed a cocked gun at him.  There was also evidence that both petitioner and Doyle had been drinking.  The court instructed the jury that it could find manslaughter if it found that petitioner had killed Doyle "upon sudden combat."  The court also instructed that what "distinguished murder from manslaughter was the absence of malice aforethought."  The jury could simply have concluded that the government failed to prove its case on the critical issue of intent given the paucity of the evidence supporting its theory of how and when petitioner killed Doyle.

In other words, the jury could have found that the circumstantial evidence supported the conclusion that McCambridge killed Doyle upon sudden combat or in the heat of passion -- for whatever reason -- but that it was not sufficient to establish malice

-72-

aforethought.[13]  There is simply no basis for concluding that the jury must have believed McCambridge's account of what sparked the incident.

Nor is the majority opinion convincing when it declares that "[n]either the fact of Doyle's conviction, nor the contested excerpt from the prosecutor's closing argument, is material to whether McCambridge used excessive force."  This argument assumes that the jury found that McCambridge acted in self-defense but with excessive force.  Yet, again, the jury could have disbelieved his self-defense claim, but convicted him of manslaughter because the circumstantial evidence supported a finding of "sudden combat" (but failed to establish malice aforethought).  If the jury had believed McCambridge's story about the origins of the altercation, it could have found that he acted in self-defense without excessive force, and thereby was entitled to an acquittal.  It is simply wrong to say that the jury must have found that McCambridge used excessive force in self defense, when we do not know if the jury accepted his claim that he acted in self-defense in the first place.

The majority is also inconsistent in its assessment of the effect on McCambridge's credibility of the prosecutor's

---

[13] As the majority points out, the jury was instructed as follows:

> Manslaughter is an unlawful, intentional killing resulting from a sudden transport of the passions or heat of blood when there is no time to deliberate and when such passion or heat of blood is produced by adequate or reasonable provocation and without malice or upon sudden combat . . . .

-73-

references in closing argument to McCambridge's unsupported claim about Doyle's conviction for child abuse. On the one hand, the majority asserts that "[a]t most the prosecutor's statement was another stab at the already damaged credibility of the defendant," suggesting that McCambridge, generally speaking, was not a credible witness. Yet the majority also asserts that the jury must have believed McCambridge's testimony that he fired on Doyle in self-defense, in support of its theory that he was convicted of manslaughter because the jury decided he used excessive force in his self-defense. This seems to be a rather selective view of McCambridge's credibility.

My own view is that McCambridge's credibility was impugned in the eyes of the jury on the critical issue of self-defense, and there is at least a reasonable probability, the Brady prejudice standard, that this damage was attributable to the prosecutor's unfair closing argument. That view draws support from the jury's conviction of McCambridge on two of the three motor vehicle offenses. These convictions indicate unmistakably that they concluded that McCambridge was driving the van at some point, a determination that required rejecting substantial parts of his account of the altercation with Doyle, the shooting, and the accident. The majority suggests that "[t]he Appeals Court could reasonably conclude . . . that once McCambridge shot Doyle, he pushed Doyle toward the back of the van and attempted to drive from the passenger's seat or the driver's seat." It is indeed possible that the jury reasoned as the majority describes, but a more

-74-

straightforward explanation is that the jury simply disbelieved McCambridge's testimony that Doyle was driving the van when he was shot.

My conclusion that McCambridge was prejudiced by the prosecutor's misconduct is consistent with our decision in United States v. Udechukwu, 11 F.3d 1101 (1st Cir. 1993), where we considered the prejudicial effect of a prosecutor's closing argument questioning the existence of exculpatory evidence the defendant claimed existed but which the prosecution failed to disclose. The defendant in that case, charged with smuggling illegal drugs into the United States from Aruba, presented a defense of duress. She testified that a man named Michael Mouma had threatened to harm her children if she did not transport drugs for him. Defense counsel attempted to obtain evidence from the prosecution to corroborate the defendant's testimony regarding Mouma and the circumstances under which she had agreed to smuggle the drugs. Although the government had information that Mouma did exist, was in Aruba, and had been a drug trafficker, that exculpatory information was never disclosed to the defense. The prosecutor then used the absence of information about Mouma to challenge Udechukwu's credibility in closing argument. In Udechukwu, as here, the defendant asserted on direct appeal[14] that

---

[14] We considered Udechukwu's Brady claim on direct appeal, rather than collateral review. For purposes of evaluating McCambridge's Brady claim, Udechukwu applies; the only difference in our standard of review for the two cases is that we must take the additional step here of determining that the appeals court decision affirming McCambridge's conviction is contrary to or an

-75-

the prosecution's <u>Brady</u> violation was magnified by the improper summation.  We stated:

> The inferences and the direct challenge to the existence of a source named Michael, however, when the prosecution had unearthed evidence that he existed and was a prominent dealer in narcotics, is indefensible.  Here we find a kind of double-acting prosecutorial error: a failure to communicate salient information, which, under [<u>Brady</u> and <u>Giglio</u>] should be disclosed to the defense, and a deliberate insinuation that the truth is to the contrary.

<u>Id.</u> at 1106.

As in the instant case, there was no question in <u>Udechukwu</u> that the defendant committed the acts alleged by the prosecution.  Udechukwu's defense of duress, like McCambridge's claim of self-defense, depended entirely on her credibility.  In <u>Udechukwu</u>, the evidence not disclosed by the prosecution only partly substantiated her defense because the fact that Mouma existed, lived in Aruba, and had been involved in illegal narcotics did not establish that Mouma ever threatened Udechukwu or asked her to smuggle drugs.  Nevertheless, we reversed Udechukwu's conviction and remanded for a new trial because we concluded that she was prejudiced by the prosecutor's improper attack on the crucial issue of her credibility: "Whether the government's failure to disclose this credibility-strengthening information could be said to be reversible error, we need not decide.  We have no doubt, however, that the prosecutor's persistent theme in closing argument suggesting the nonexistence of this information . . . did fatally

unreasonable application of clearly established federal law.

-76-

taint the trial." Id. at 1105.[15]  Thus, I conclude that the prosecutor's insinuation during closing argument that McCambridge had lied about Doyle's criminal record likewise tainted the McCambridge trial in the relevant Brady sense.[16]  It deprived McCambridge of "a trial resulting in a verdict worthy of confidence."[17]  Strickler, 527 U.S. at 289-90.

Nevertheless, my conclusion that McCambridge was prejudiced by the prosecution's failure to disclose Doyle's conviction would not be sufficient to warrant the issuance of a writ of habeas corpus.  I must also conclude that the determination of the appeals court on this issue constituted an unreasonable application of clearly established federal law as articulated by

---

[15] Massachusetts law is consistent with our own in this regard. In Commonwealth v. Collins, 434 N.E.2d 964, 969 (Mass. 1982), the Supreme Judicial Court stated: "When the failure to disclose is coupled with the blatant misrepresentation made by the prosecutor in his closing argument to the jury, the conclusion that the conviction cannot stand is inescapable."

[16] I find wholly unpersuasive the suggestion of the majority that McCambridge somehow benefitted from the unavailability of Doyle's complete criminal record, which would have revealed the conviction for child neglect.  The harm to McCambridge caused by the prosecutor's failure to abide by his representation to the judge and to defense counsel that he would not question the fact of Doyle's conviction vastly outweighs any advantage McCambridge gained by not having the jury learn that Doyle's conviction was for child neglect rather than child abuse.

[17] In distinguishing Udechukwu, the majority says that here the prosecutor did not make knowing misrepresentations to the jury. That may or may not be true.  Indisputably, however, the prosecutor made a knowing misrepresentation to the judge and to defense counsel prior to closing argument that he would not argue to the jury the absence of evidence that Doyle had been convicted of child abuse.  This conduct cannot be excused as "sloppiness."

the Supreme Court.[18]  See 28 U.S.C. § 2254(d)(1).  The appeals court found no prejudice for two reasons.  First, it observed that "there was no prejudice to [McCambridge] because he was aware of the victim's record and was prepared to offer such evidence at trial." McCambridge, 690 N.E.2d at 475.  That observation is entirely beside the point.  McCambridge did not wish to offer proof of the victim's record because he agreed with the trial court that the truth about that record was irrelevant.  McCambridge had referred to Doyle's record in his testimony and his closing argument only to explain the origin of the altercation.  The truth of the record only became an issue at the end of the trial because of the prosecutor's unfair attack on McCambridge's credibility in closing argument.

Second, the appeals court said that the jury must have believed McCambridge's account of the struggle and its cause given his conviction for manslaughter: "By convicting the defendant of manslaughter, the jury obviously credited the defendant's testimony that the struggle in the van was precipitated by the defendant's remark about [the conviction] to Doyle." McCambridge, 690 N.E.2d at 475.  As I have explained in my analysis of the majority's similar assessment of the prejudice issue, the court's conclusion that the jury "obviously credited" McCambridge's testimony rests on

---

[18]    I agree with the majority's reformulation of the content of the "unreasonable application" clause of 28 U.S.C. § 2254(d)(1) in light of Williams v. Taylor, 529 U.S. 362 (2000).

a faulty, unduly speculative premise.[19] The jury may well have reached a manslaughter verdict for any number of reasons having nothing to do with its crediting of McCambridge's insistence that the struggle was precipitated by his remark about Doyle's conviction. All that can be said with certainty about the jury's evaluation of McCambridge's claim of self-defense is that the jury did not credit his testimony sufficiently to acquit him. Rather, their verdict strongly suggested a negative judgment about McCambridge's credibility, in a case where the Commonwealth's evidence was circumstantial and, on important points, inconclusive.

In summary, the state appeals court's conclusion that the outcome of McCambridge's trial would not have been different if the evidence of Doyle's conviction had been disclosed rests on an irrelevant observation and an unduly speculative premise. Under these circumstances, I must conclude that the court's no prejudice determination constitutes an unreasonable application of clearly established federal law regarding prejudice in the Brady context, and the writ of habeas corpus should be granted.

---

[19] The district court agreed with the Massachusetts Appeals Court that McCambridge had not been prejudiced by the prosecutor's nondisclosure. It concluded that the jury must have found enough plausibility in McCambridge's account to reject a first or second degree murder conviction: "[T]he jury must have accepted that [McCambridge's] provocation story at least raised some reasonable doubt in order to convict on manslaughter rather than first- or second-degree murder." This conclusion is unduly restrictive in its view that McCambridge received his due because he avoided a murder conviction. McCambridge was also entitled to fair consideration of his claim that he was not guilty of manslaughter.